COPY

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
    Claude M. Stern (Bar No. 96737)
2   claudestern@quinnemanuel.com
    Evette D. Pennypacker (Bar No. 203515)
3   evettepennypacker@quinnemanuel.com
    Igor Piryazev (Bar No. 253149)
4   igorpiryazev@quinnemanuel.com
    555 Twin Dolphin Drive, Suite 560
5   Redwood Shores, California 94065-2139
    Telephone:    (650) 801-5000
6   Facsimile:     (650) 801-5100

7   Attorneys for Zynga, Inc.

8

9               UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

| | |
|---|---|
| 12   ZYNGA GAME NETWORK, INC., a<br>Delaware Corporation | CASE NO. _____ |
| 13 | |
|           Plaintiff, | **ZYNGA GAME NETWORK, INC.'S** |
| 14 | **COMPLAINT** |
|     vs. | |
| 15 | |
| KYLE MCEACHERN, an individual, and | **DEMAND FOR JURY TRIAL** |
| 16   DOES I through X, | |
| 17 | |
|          Defendants. | |
| 18 | |

19

20             **DOCUMENT SUBMITTED UNDER SEAL**

21

22

23

24

25

26

27

28

1      Plaintiff Zynga Game Network, Inc. ("Zynga") complains against Kyle McEachern and

2  Does I through X as follows:

3                                    **THE PARTIES**

4      1.      Zynga is a Delaware corporation with its principal place of business at 365

5  Vermont Street, San Francisco, California.

6      2.      Zynga is informed and believes and on that basis alleges that Kyle McEachern is an

7  individual residing in California at 40 Dorado Terrace, Apt. B in San Francisco, California 94112.

8      3.      Zynga is ignorant of the true names of Does I through X and such names are

9  fictitious.  Once Zynga learns of the true names of Does I through X, Zynga will amend its

10  complaint to include the real name(s) of such party or parties.

11                           **JURISDICTION AND VENUE**

12     4.      This Court has subject matter jurisdiction under 17 U.S.C. § 502 and 28 U.S.C.

13  §§ 1331, 1338(a), 1338(b) & 1367.

14     5.      Venue is proper in this District under the provisions of 28 U.S.C. § 1391(b)(2),

15  because a substantial part of the events or omissions giving rise to the claims occurred, or a

16  substantial part of the property that is the subject of the action is located, in this judicial district.

17                          **INTRADISTRICT ASSIGNMENT**

18     6.      Because this action is an Intellectual Property Action within the meaning of Civil

19  Local Rule 3-2(c), the action is to be assigned on a district-wide basis.

20                        **FACTS COMMON TO ALL CLAIMS**

21                                 **Zynga's Business**

22     7.      Zynga was founded in February 2007 specifically to add a social element to casual

23  online games.  Zynga is now the number one social gaming company on the web.  Zynga makes

24  and distributes a variety of online social games, including casino games, word games, board

25  games, role playing games and party games.  These games can be found on social networking sites

26  such as Facebook, MySpace, Bebo, Friendster, and Hi5.  One of Zynga's most popular games is

27  Mafia Wars.

28

## Kyle McEachern's Zynga Employment

8.    Defendant Kyle McEachern was employed by Zynga from approximately February 15, 2008 through February 20, 2009. On information and belief, during that time, McEachern was intimately involved in all aspects of Zynga's most popular and most profitable online game: Mafia Wars. In particular, on information and belief, McEachern was intimately involved in all of the critical decisions regarding user experience, the technology, and responses to unauthorized access into the Mafia Wars source code.

9.    At the outset of his employment with Zynga, McEachern entered into an employment agreement ("Employment Agreement") and an invention assignment and confidentiality agreement ("Invention Assignment Agreement") with Zynga. A copy of the Employment Agreement is attached hereto as Exhibit A and incorporated by reference herein. A copy of the Invention Assignment Agreement is attached hereto as Exhibit B and incorporated by reference herein. In the Employment and Invention Assignment Agreements, McEachern agreed that for the duration of his employment and after termination of his employment he would keep and hold Zynga's proprietary information in strict confidence and trust (see paragraph 8 of Exhibit A and paragraph 3 of Exhibit B ). McEachern further agreed that a breach or threatened breach of the Employment Agreement would entitle Zynga to injunctive relief (see paragraph 15 of Exhibit A).

10.    On information and belief, while McEachern was a Zynga employee, he referred to himself by and used names other than Kyle McEachern. For example, many people at Zynga referred to McEachern as "K2." McEachern also set up a Facebook account under the name Abigail Devereaux in order to test games he was working on for Zynga.

11.    McEachern terminated his employment with Zynga on or about February 20, 2009. As part of the termination process, McEachern signed a "Termination Certificate," a copy of which is attached hereto as Exhibit C and incorporated by reference herein. In the Termination Certificate, McEachern certified that he did not have in his possession and had not failed to return "any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property or any

51514/2877546.1

1 | reproductions of any aforementioned items belonging to Zynga." McEachern further certified that

2 | he would "preserve as confidential all trade secrets, confidential knowledge, data or other

3 | proprietary information relating to" Zynga's business.

4 |     12.    On information and belief, before McEachern returned his computer to Zynga at

5 | the end of his employment, McEachern erased documents from his company hard drive. Zynga

6 | did not discover this erasure until weeks after the termination of McEachern's employment with

7 | Zynga.

8 |     13.    On or about March 13, 2009, McEachern and Zynga entered into a consulting

9 | agreement whereby McEachern would provide certain specified services to Zynga for particular

10 | Mafia Wars projects ("Consulting Agreement"). A copy of the Consulting Agreement is attached

11 | hereto as Exhibit D and incorporated by reference herein. In the Consulting Agreement,

12 | McEachern again agreed to keep Zynga's business information confidential and not to use the

13 | information in any way other than to perform the services for Zynga specified in the agreement

14 | (see paragraph 4 of Exhibit D). McEachern further agreed that he would not directly or indirectly

15 | provide services to a company that is competitive with the types and kinds of business being

16 | conducted by Zynga (see paragraph 5.1 of Exhibit D), and that Zynga has the right to enforce the

17 | Consulting Agreement and any of its provisions by injunction or other equitable relief without

18 | having to post a bond or other consideration.

19 |     14.    On information and belief, McEachern's work on the consulting agreement was

20 | completed on April 3, 2009.

21 | **Kyle McEachern Gains Unauthorized Access To Zynga's Servers**

22 |     15.    Zynga's servers are password protected and contain security measures and

23 | procedures to prevent the unauthorized access of its servers and the data and other information

24 | contained therein. Even within the Zynga organization, employees and contractors are typically

25 | only given access to the servers containing the information the employees and contractors need to

26 | reasonably conduct their responsibilities at Zynga. McEachern was not an exception to this

27 | general Zynga practice. Upon termination of his employment in February 2008, McEachern's

28 | access to Zynga's computers was supposed to come to an end, and McEachern was supposed to

1 | turn over all of his access codes and passwords. And, as a consultant, McEachern was given only

2 | limited access to the servers and data McEachern needed to perform his consulting duties.

3 |      16.    On information and belief, in direct contravention of his Employment Agreement,

4 | Invention Assignment Agreement and the statements he attested to in his Termination Certificate,

5 | McEachern retained certain passwords and/or keys that would allow him to continue to access

6 | Zynga's proprietary and confidential servers after his formal employment with Zynga ended. On

7 | information and belief, McEachern used these passwords and/or keys to gain unauthorized access

8 | to Zynga's servers, as described below.

9 |      17.    On Saturday April 4, 2009, the day after McEachern's consulting work for Zynga

10 | was completed, Zynga learned that its Mafia Wars source code had been modified to insert a

11 | banner advertisement for a competing game entitled "Mob Underworld." Zynga did not plan,

12 | authorize or initiate the change to its code to insert this banner advertisement. Zynga conducted

13 | an investigation of this breach of its systems and learned that, on information and belief, its former

14 | employee and contractor, Kyle McEachern, had used a Zynga account to which McEachern was

15 | no longer entitled to access, in order to penetrate Zynga's servers to make the modification to

16 | Zynga's Mafia Wars source code.

17 |      18.    On information and belief, Zynga employees were blocked from viewing the Mob

18 | Underworld banner advertisement unlawfully placed in Zynga's Mafia Wars home page. On

19 | further information and belief, California residents were blocked from accessing the Mob

20 | Underworld game. On information and belief McEachern took these measures to hide his

21 | circumvention of Zynga's computer security systems to unlawfully access and appropriate

22 | Zynga's confidential and proprietary information and use of such confidential and proprietary

23 | information to create and promote a competing online game.

24 |      19.    On information and belief, McEachern used the alias Chris Drayke to publish and

25 | promote his Mob Underworld game. On further information and belief, McEachern further used

26 | the Abigail Devereaux Facebook page, which McEachern used to test games while he was a

27 | Zynga employee, to promote his Mob Underworld game. On further information and belief,

28 | McEachern used these aliases in an attempt to hide the fact that McEachern used Zynga's

1  confidential and proprietary information and circumvented Zynga's computer security systems to

2  unlawfully obtain such confidential and proprietary information in order to create and promote a

3  competing game.

4       20.     After learning of this breach by McEachern, Zynga promptly took measures to

5  disable McEachern's access to Zynga's servers.  Early in the morning of April 7, 2009, Zynga

6  learned, through these measures, that the same IP address used to gain unauthorized access to

7  Zynga's servers to modify Zynga's Mafia Wars source code on April 4, 2009 had attempted to log

8  into a protected Zynga server.  Zynga promptly logged into that protected server to investigate and

9  learned that a large amount of Zynga's proprietary data had been downloaded into a tar file on

10 February 20, 2009—the same day as McEachern's last day as a Zynga employee.

11      21.     This tar file included the entire Zynga payments source tree (source code to the

12 software system that does payment processing—credit card processing and anti-fraud screening),

13 including the anti-fraud engine.  Also downloaded were specific files dealing with payments,

14 revenue, system security, and management of virtual currency—some of the most sensitive data

15 on Zynga's servers.  These files had to be collected from many different locations and assembled

16 into a single directory; they would not typically be found together.  The directory also included

17 email addresses of Zynga's Mafia Wars users and an entire dump of the Guild of Heroes game

18 database, including schema, logs of viral activities and customer contact information.

19 **Kyle McEachern Copies and Uses Zynga's Copyrighted Mafia Wars Source Code, Customer**

20 **List and Other Confidential, Proprietary and Secret Information**

21      22.     On information and belief, McEachern willfully and intentionally copied Mafia

22 Wars code and used it in his Mob Underworld game.  Zynga's analysis of the Mob Underworld

23 code reveals that, on information and belief, the Mob Underworld code contains exact copies of

24 aspects of Zynga's Mafia Wars code.

25      23.     On information and belief, McEachern willfully and intentionally copied, exercised

26 unlawful dominion and control, and appropriated for his own use, Zynga's confidential,

27 copyrighted and proprietary Mafia Wars source code, and the Mafia Wars customer list, customer

28 account information, Zynga financial information, security systems, network systems, and

1     operational systems information about how Zynga conducts its operations for millions of users of

2     Zynga on-line games, and technologies and processes used by Zynga to attract users to its social

3     gaming applications and then monetize them ("the stolen Zynga information").

4         24.     As a result of McEachern's actions regarding the stolen Zynga information, Zynga

5     has been and will continue to be injured in an amount to be established according to proof.

6         25.     As a result of McEachern's actions regarding the stolen Zynga information, Zynga

7     has been and will continue to be irreparably injured. Zinga's injuries are not fully compensable in

8     monetary damages.

9

10                         **FIRST CLAIM FOR RELIEF**

11          **(Violation of The Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.*)**

12         26.     Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

13     through 25.

14         27.     Zynga is the owner of a valid copyrighted work in the form of its Mafia Wars

15     computer source code.

16         28.     This computer source code is effectively controlled by a technological security

17     measure.

18         29.     McEachern intentionally and willfully circumvented the technological security

19     measure that controls Zynga's copyrighted computer source code for purposes, among others, of

20     seeking and obtaining commercial advantage or private financial gain.

21         30.     McEachern's actions as alleged above have caused Zynga injury and damages to be

22     established according to proof. Because of this circumvention by McEachern, Zynga was and

23     continues to be irreparably harmed. Zynga's remedy at law is not by itself sufficient to

24     compensate Zynga for all the irreparable injuries inflicted and threatened by McEachern, and

25     Zynga is therefore entitled to a temporary restraining order, a writ of seizure and attachment, a

26     preliminary injunction, and a permanent injunction to prohibit McEachern from continuing his

27     unlawful actions.

28

1      31.     In addition to equitable relief, Zynga demands monetary damages, fees and costs,

2   where allowed.

3

4                        **SECOND CLAIM FOR RELIEF**

5          **(Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*)**

6      32.     Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

7   through 31.

8      33.     Zygna's computer source code, customer lists and databases were and are protected

9   by technological measures on Zynga's servers.

10     34.     By improperly gaining access to Zygna's computer source code, customer lists and

11  databases, McEachern knowingly transmitted codes and commands that McEachern intended to

12  transmit in order to cause harm or damage to Zygna's computer source code, customer lists,

13  databases and Zynga.

14     35.     McEachern gained access to Zygna's computer source code, customer lists and

15  databases without the permission or authorization of Zynga.

16     36.     Because of these actions, Zynga was and continues to be irreparably harmed and

17  Zynga's damages, incurred over a period of less than one year, exceed $5,000.

18     37.     Zynga's remedy at law is not by itself sufficient to compensate Zynga for all the

19  irreparable injuries inflicted and threatened by McEachern, and Zynga is therefore entitled to a

20  temporary restraining order, a writ of seizure and attachment, a preliminary injunction, and a

21  permanent injunction to prohibit McEachern from continuing his unlawful actions.

22     38.     In addition to equitable relief, Zynga demands monetary damages, fees and costs,

23  where allowed.

24

25                        **THIRD CLAIM FOR RELIEF**

26            **(Copyright Infringement—17 U.S.C. § 101 *et seq.*)**

27     39.     Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

28  through 38.

                          COMPLAINT; DEMAND FOR JURY TRIAL

1       40.    Zynga's source code for the Mafia Wars online game is an original work of

2 authorship fixed in a tangible medium of expression.

3       41.    Zynga owns the copyright for the source code for the Mafia Wars game, and it has

4 applied to the United States Copyright Office for a certificate of registration covering that source

5 code.

6       42.    On information and belief, McEachern willfully and intentionally violated Zynga's

7 copyrights in the source code for the Mafia Wars game by engaging in at least the following

8 unauthorized and unlawful actions: (a) making unauthorized copies of Zynga's copyrighted

9 source code for the Mafia Wars game, (b) creating a derivative work by modifying that source

10 code to imbed a banner advertisement in Zynga's Mafia Wars web page that described and

11 advertised defendant's own competing Mob Underground game, and (c) making unauthorized use

12 of Zynga's copyrighted Mafia Wars source code in the source code for defendant's competing

13 Mob Underground game.

14       43.    Zynga has not licensed or otherwise authorized McEachern to use its Mafia Wars

15 game source code. As a consequence, McEachern's use, modification production, display,

16 publication, creation of derivative works from and distribution of the Mafia Wars source code

17 infringes Zynga's exclusive rights as owner of the copyright in the Mafia Wars game source code

18 owned by Zynga.

19       44.    Upon information and belief, McEachern's willful infringement has undermined

20 the value of the Mafia Wars game source code, depriving Zynga of the additional sales and

21 goodwill.

22       45.    McEachern has reproduced and distributed, including by electronic means, over at

23 least the last four days, one or more copies of one or more copyrighted works belonging to Zynga,

24 which have a total retail value of more than $1,000; and distributed a work being prepared for

25 commercial distribution, made the work available on a computer network accessible to members

26 of the public, where, on information and belief, McEachern knew or should have known that the

27 work was intended for commercial distribution.

28

1     46.    Because McEachern's actions have caused, and will continue to cause, irreparable

2    damage to Zynga for which it has no remedy at law, Zynga is entitled to a temporary restraining

3    order, a writ of seizure and attachment, a preliminary injunction and permanent injunction

4    restraining and enjoining defendant and his agents, servants, employees, and all persons acting

5    thereunder, in concert therewith or on their behalf, from copyright, displaying, distributing, or

6    otherwise using Zynga's copyrighted work in violation of 17 U.S.C. § 106.

7     47.    Zynga is further entitled to an award of its damages and of defendant's profits

8    attributable to such infringements, or, at Zynga's election, statutory damages in an amount up to

9    $150,000.

10     48.    Zynga is further entitled to recover the costs of suit and reasonable attorneys' fees,

11    pursuant to 17 U.S.C. § 504.

12

13                          **FOURTH CLAIM FOR RELIEF**

14                                **(Breach of Contract)**

15     49.    Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

16    through 48.

17     50.    The Consulting Agreement, Employment Agreement and Invention Assignment

18    Agreement are valid contracts and all conditions precedent to their enforcement have been

19    performed.

20     51.    Under the Invention Assignment Agreement and Consulting Agreement, Zynga

21    owns any "innovations," and other intellectual property rights developed by Defendant alone or

22    jointly with others, and McEachern had a duty to transfer any intellectual property rights he might

23    have had to defendant. Under the Employment Agreement, Consulting Agreement and Invention

24    Assignment Agreement McEachern has duties of confidentiality, to refrain from disclosing

25    proprietary information, and to refrain from competing with Zynga.

26     52.    McEachern has breached his duties under these contracts by misappropriating

27    Zynga's proprietary and confidential information including Zynga's computer source code,

28    customer lists and databases and using that information to compete with Zynga.

1    53.    As a direct and proximate result of these acts, McEachern has received and will

2  receive sales and profits.

3    54.    As a direct and proximate result of McEachern's wrongful conduct, Zynga has been

4  irreparably injured by such wrongful acts and the Consulting Agreement and the Invention

5  Assignment Agreement contain provisions specifying that, among other things, Zynga is entitled

6  to injunctive and other equitable relief in the case of McEachern's breach.  Zynga is therefore

7  entitled to a temporary restraining order, a writ of seizure and attachment, a preliminary

8  injunction, and a permanent injunction to prohibit McEachern from continuing his unlawful

9  actions.

10    55.    In addition to equitable relief, Zynga demands monetary damages, fees and costs,

11  where allowed.

12

13                          **FIFTH CLAIM FOR RELIEF**

14                          **(Breach of Confidence)**

15    56.    Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

16  through 55.

17    57.    Zynga conveyed confidential and novel information to McEachern during the

18  course of McEachern's employment.

19    58.    McEachern had knowledge that Zynga disclosed the information in confidence, as

20  per the terms of the Employment Agreement, the Invention Assignment Agreement, and the

21  Consulting Agreement.

22    59.   ` There was an understanding between McEachern and Zynga that confidence be

23  maintained, as per the terms of the Employment Agreement, the Invention Assignment

24  Agreement, and the Consulting Agreement.

25    60.    There was disclosure or use in violation of the understanding of confidence when

26  McEachern copied and put to his own use Zynga's proprietary computer source code, customer

27  lists, and databases.

28

- 11 -

Case No.

1       61.      Zynga's remedy at law is not by itself sufficient to compensate Zynga for all the

2   irreparable injuries inflicted and threatened by McEachern, and Zynga is therefore entitled to a

3   temporary restraining order, a writ of seizure and attachment, a preliminary injunction, and a

4   permanent injunction to prohibit McEachern from continuing his unlawful actions.

5       62.      In addition to equitable relief, Zynga demands monetary damages, fees and costs,

6   where allowed.

7

8                         **SIXTH CLAIM FOR RELIEF**

9                             **(Conversion)**

10      63.      Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

11   through 62.

12      64.      Zynga is, and has always been, the true owner of the computer code at issue.

13   Zynga was also the owner of the computer code at the time of the conversion by Defendant.

14      65.      McEachern willfully and without legal justification interfered with Zynga's right to

15   ownership of the computer code by copying the code, passing it off as his own, and making

16   modifications to the code on Zynga's computer system.

17      66.      Plaintiff continues to suffer harm from McEachern's conversion and continued use

18   of Plaintiff's proprietary computer code. Zynga's remedy at law is not by itself sufficient to

19   compensate Zynga for all the irreparable injuries inflicted and threatened by McEachern, and

20   Zynga is therefore entitled to a temporary restraining order, a writ of seizure and attachment, a

21   preliminary injunction, and a permanent injunction to prohibit McEachern from continuing his

22   unlawful actions.

23      67.      In addition to equitable relief, Zynga demands monetary damages, fees and costs,

24   where allowed.

25

26

27

28

51514/2877546.1

Case No.

COMPLAINT; DEMAND FOR JURY TRIAL

## SEVENTH CLAIM FOR RELIEF

### (Trade Secret Misappropriation)

68.   Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1 through 67.

69.   The computer code, customer lists and databases at issue in this matter are constitutive and contain sensitive, trade secret information.

70.   McEachern improperly appropriated Zynga's trade secrets when he broke into Zynga's servers and took Zynga's computer source code, customer lists and databases without permission.

71.   McEachern used the trade secret information to create a competing enterprise.

72.   Defendant's use of the trade secret information resulted in damage to Zynga and in Defendant's unjust enrichment.

73.   Zynga's remedy at law is not by itself sufficient to compensate Zynga for all the irreparable injuries inflicted and threatened by McEachern, and  Zynga is therefore entitled to a temporary restraining order, a writ of seizure and attachment, a preliminary injunction, and a permanent injunction to prohibit McEachern from continuing his unlawful actions.

74.   In addition to equitable relief, Zynga demands monetary damages, fees and costs, where allowed.

## EIGHTH CLAIM FOR RELIEF

### (Trespass)

75.   Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1 through 74.

76.   Zynga is the current lawful owner of the computer source code, customer lists and databases at issue in this matter, and the hardware and network(s) on which the computer source code, customer lists and databases are stored.

77.   McEachern intentionally and without authorization interfered with Zynga's possessory interest in its server system by circumventing existing security systems, copying the

51514/2877546.1

Case No. _____

COMPLAINT; DEMAND FOR JURY TRIAL

1   computer source code, modifying the computer source code, claiming that the computer source

2   code belongs to Defendant, and by taking Zynga's customer lists and databases.

3       78.     Zynga did not authorize or otherwise give permission to McEachern to use, copy,

4   modify, or in any way access the computer source code, customer lists or databases.

5       79.     Zynga continues to suffer harm from the ongoing trespass.

6       80.     McEachern's unauthorized entry into Zynga's system and misappropriation of

7   Zynga's sensitive, proprietary information is the direct cause of Zynga's harm.  McEachern's

8   unauthorized use proximately resulted in damage to Zynga.

9       81.     Zynga's remedy at law is not by itself sufficient to compensate Zynga for all the

10  irreparable injuries inflicted and threatened by McEachern, and  Zynga is therefore entitled to a

11  temporary restraining order, a writ of seizure and attachment, a preliminary injunction, and a

12  permanent injunction to prohibit McEachern from continuing his unlawful actions.

13      82.     In addition to equitable relief, Zynga demands monetary damages, fees and costs,

14  where allowed.

15

16                  **NINTH CLAIM FOR RELIEF**

17          **(False Advertising—Lanham Act § 43(a), 15 U.S.C. § 1125(a))**

18

19      83.     Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

20  through 82.

21      84.     As detailed above, McEachern placed a banner advertisement for his "Mob

22  Underground" game in Zynga's web page for its Mafia Wars online game, which falsely and

23  misleadingly implies an association between defendant's Mob Underworld game and Zynga's

24  Mafia Wars game.

25      85.     Defendant's banner advertisement has actually deceived or is likely to continue to

26  deceive members of the public.

27      86.     Defendant caused the banner advertisement to enter interstate commerce.

28

1    87.    Defendant's false and misleading placement of the banner advertisement for

2  defendant's Mob Underworld game is material, and Zynga has been injured as a result of the

3  direct diversion of users from Zynga and by diminishment of the goodwill associated with the

4  Zynga game.

5    88.    Zynga is entitled to an award of damages against defendant to compensate it for

6  these injuries as well as costs and attorneys' fees.

7    89.    Zynga's remedy at law is not by itself sufficient to compensate Zynga for all the

8  irreparable injuries inflicted and threatened by McEachern, and  Zynga is therefore entitled to a

9  temporary restraining order, a writ of seizure and attachment, a preliminary injunction, and a

10  permanent injunction to prohibit McEachern from continuing his unlawful actions.

11    90.    McEachern's false and misleading placement of the banner advertisement was done

12  willfully and intentionally, in bad faith and in conscious disregard of Zynga's rights and the rights

13  of the public.  As a consequence, Zynga is entitled treble damages and a disgorgement of

14  defendant's profits, gains and advantages derived from these unlawful acts.

15

16                    **TENTH CLAIM FOR RELIEF**

17          **(False Designation of Origin—Lanham Act § 43(a), 15 U.S.C. § 1125(a))**

18    91.    Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

19  through 90.

20    92.    McEachern's placement of the banner advertisement for McEachern's Mob

21  Underworld game on the Mafia Wars site creates confusion as to the origin of the Mob

22  Underworld and Mafia Wars games.

23    93.    McEachern caused the banner advertisement to enter interstate commerce.

24    94.    By failing to properly attribute the Mob Underground game, McEachern's conduct

25  constitutes "false designation of origin" under Section 43(a) of the Lanham Act.

26    95.    McEachern's false designation of origin is material, and Zynga has been injured as

27  a result of the confusion caused regarding the source of the banner advertisement for the Mob

28  Underground game.

1        96.      Zynga is entitled to an award of damages against McEachern to compensate it for

2 these injuries as well as costs and attorneys' fees.

3        97.      Zynga's remedy at law is not by itself sufficient to compensate Zynga for all the

4 irreparable injuries inflicted and threatened by McEachern, and Zynga is therefore entitled to a

5 temporary restraining order, a writ of seizure and attachment, a preliminary injunction, and a

6 permanent injunction to prohibit McEachern from continuing his unlawful actions.

7        98.      The false designation of origin with regard to the banner advertisement was willful

8 and intentional, in bad faith and in conscious disregard of Zynga's rights and the rights of the

9 public. As a consequence, Zynga is entitled treble damages and a disgorgement of McEachern's

10 profits, gains and advantages derived from these unlawful acts.

11

12                                **ELEVENTH CLAIM FOR RELIEF**

13            **(False Advertising—California Bus. & Prof. Code § 17500 *et seq.*)**

14        99.      Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

15 through 98.

16       100.     McEachern's acts as described above constitute false and/or misleading advertising

17 and are likely to mislead the general public and are therefore violative of California Business &

18 Professions Code §§ 17500, et seq.

19       101.     The acts of untrue and misleading advertising by McEachern described above

20 present a continuing threat to members of the public in that McEachern will misrepresent the

21 nature, characteristics, or qualities of the Mob Underworld game and its relationship to Zynga and

22 Zynga technology. McEachern disseminated this advertising publicly, and knew, or in the

23 exercise of reasonable care should have known, that it was untrue and misleading.

24       102.     As a direct and proximate result of the above-described acts, McEachern has

25 created confusion in the marketplace, discouraging competition and misleading customers into

26 playing McEachern's game over Zynga's game out of a false understanding as to the relative

27 quality of the products.

28

1      103.    McEachern's false and misleading advertising has permitted and will permit

2  McEachern to make sales and profits on the strength of Zynga's success, goodwill, and consumer

3  recognition.

4      104.    Zynga is entitled to an award of damages against McEachern to compensate it for

5  these injuries as well as costs and attorneys' fees.

6      105.    Zynga's remedy at law is not by itself sufficient to compensate Zynga for all the

7  irreparable injuries inflicted and threatened by McEachern, and Zynga is therefore entitled to a

8  temporary restraining order, a writ of seizure and attachment, a preliminary injunction, and a

9  permanent injunction to prohibit McEachern from continuing his unlawful actions.

10

11                  **TWELFTH CLAIM FOR RELIEF**

12       **(Unlawful Business Practices—California Bus. & Prof. Code § 17200 *et seq.*)**

13      106.    Zynga hereby realleges, as if set forth fully herein, the allegations of paragraphs 1

14  through 105.

15      107.    The acts of McEachern described above are likely to mislead the general public in

16  violation of the Lanham Act, 5 U.S.C. § 1125(a)(1)(A), and therefore unlawful business practices

17  in violation of California Business & Professions Code §§ 17200, et seq.

18      108.    The unlawful, unfair, and/or deceptive business practices of McEachern described

19  above present a continuing threat to members of the public in that McEachern intends to promote

20  and advertise the sale of Mob Underworld by making false and misleading representations

21  regarding the nature, characteristics, or qualities of the parties' products, and of Mob

22  Underworld's relationship to Zynga and Zynga's technology, and that McEachern may continue to

23  use the confidential and proprietary information he misappropriated from Zynga.

24      109.    As a direct and proximate result of these acts, McEachern has received and will

25  receive sales and profits.

26      110.    As a direct and proximate result of McEachern's wrongful conduct, Zynga has been

27  irreparably injured by such wrongful acts, and Zynga is therefore entitled to a temporary

28

1 │ restraining order, a writ of seizure and attachment, a preliminary injunction, and a permanent

2 │ injunction to prohibit McEachern from continuing his unlawful actions.

3

4 │ ### PRAYER FOR RELIEF

5 │ WHEREFORE, Zynga respectfully requests the following relief:

6 │ 1.    Judgment in favor of Zynga and against McEachern on all of Zynga's claims

7 │ asserted in its Complaint;

8 │ 2.    That the Court grant Zynga an award of lost profits, McEachern's ill-gotten gains

9 │ or profits, disgorgement, restitution and/or damages in an amount to be proven at trial, and trebled

10 │ in light of McEachern's willful conduct;

11 │ 3.    That the Court grant Zynga pre-judgment interest on all such damages;

12 │ 4.    That the Court grant Zynga an award for reasonable attorneys' fees and costs of suit

13 │ incurred herein;

14 │ 5.    That the Court grant Zynga such equitable relief as is requested above, including

15 │ but not limited to a temporary restraining order, writ of seizure, preliminary and permanent

16 │ injunctive relief; and,

17 │ 6.    That the Court award Zynga such other and further relief as the Court deems just

18 │ and proper.

19

20 │ DATED:  April 9, 2009          Respectfully submitted,

21 │                               QUINN EMANUEL URQUHART OLIVER &
   │                               HEDGES, LLP

22

23
   │                               By
24 │                                 Claude M. Stern
   │                                 Attorney for Zynga, Inc.
25

26

27

28

51514/2877546.1

- 18 -

Case No. _____

COMPLAINT; DEMAND FOR JURY TRIAL

1

**JURY DEMAND**

2          Pursuant to Federal Rule of Civil Procedure 38(b), Zynga, Inc. hereby demands trial by

3     jury of all issues properly triable thereby.

4     DATED:  April 9, 2009                    Respectfully submitted,

5                                              QUINN EMANUEL URQUHART OLIVER &
                                               HEDGES, LLP
6

7                                              By
8                                                  Claude M. Stern
                                                   Attorney for Zynga, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit  A

February 15, 2008

Kyle McEachern
40 Dorado Terrace Apt B
San Francisco, CA 94112

Re: <u>Offer of Employment by Presidio Media Inc.</u>

Dear Kyle:

I am very pleased to confirm our offer to you of employment with Presidio Media Inc., a Delaware corporation (the "***Company***"), in the position of software engineer. You will initially report to the Company's Vice President of Product Development, Kyle Stewart. The terms of our offer and the benefits currently provided by the Company are as follows:

1.  **Starting Salary**. Your starting salary will be eighty five thousand dollars ($85,000.00) per year and will be subject to periodic review and adjustment in accordance with the Company's then-current policies.

2.  **Benefits**. You will be eligible to participate in regular health insurance, bonus and other employee benefit plans established by the Company for its employees from time to time.

The Company reserves the right to change or otherwise modify, in its sole discretion, the preceding terms of employment, as well as any of the terms set forth herein at any time in the future.

3.  **Confidentiality**. As an employee of the Company, you will have access to certain confidential information of the Company and you may, during the course of your employment, develop certain information or inventions that will be the property of the Company. To protect the interests of the Company, you will need to sign the Company's standard Employee Invention Assignment and Confidentiality Agreement in the form attached hereto as <u>Exhibit A</u> as a condition of your employment. We wish to impress upon you that we do not want you to, and we hereby direct you not to, bring with you any confidential or proprietary material of any former employer or to violate any other obligations you may have to any former employer. During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company. You will disclose to the Company in writing any other gainful employment, business or activity that you are currently associated with or participate in that competes with the Company. You will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company. You represent that your signing of this offer letter, the agreement concerning stock options granted to you, if any, under the Plan (as defined below) and the Company's Employee Invention Assignment and Confidentiality Agreement, and your commencement of employment with the Company, will not violate any agreement currently in place between yourself and current or past employers.

4.  **Options**. We will recommend to the Board of Directors of the Company that you be granted the opportunity to purchase up to ten thousand (10,000) shares of Common Stock of the Company under the Company's 2007 Equity Incentive Plan (the "***Plan***") at the fair market value of the Company's Common Stock, as determined by the Board of Directors on the date the Board approves such grant. The shares you will be given an opportunity to purchase will vest over a four (4) year period for so

H9000/00382/DOCS/1819854.1

Employment Offer
Page 2

long as you continue to be employed by the Company on the following schedule: one fourth (1/4) of the shares will vest at the end of your first anniversary with the Company, and an additional one forty-eighth (1/48[th]) of the shares will vest monthly thereafter. However, the grant of such options by the Company is subject to the Board's approval and the adoption of the Plan and this promise to recommend such approval is not a promise of compensation and is not intended to create any obligation on the part of the Company. Further details on the Plan and any specific option grant to you will be provided upon approval of such grant by the Company's Board of Directors.

5.     **At Will Employment**.   While we look forward to a long and profitable relationship, should you decide to accept our offer, you will be an at-will employee of the Company, which means the employment relationship can be terminated by either of us for any reason, at any time, with or without prior notice and with or without cause. Any statements or representations to the contrary (and any statements contradicting any provision in this letter) should be regarded by you as ineffective. Further, your participation in any stock incentive or benefit program is not to be regarded as assuring you of continuing employment for any particular period of time. Any modification or change in your at will employment status may only occur by way of a written employment agreement signed by you and the Chief Executive Officer of the Company.

6.     **Authorization to Work**.   Please note that because of employer regulations adopted in the Immigration Reform and Control Act of 1986, within three (3) business days of starting your new position you will need to present documentation demonstrating that you have authorization to work in the United States. If you have questions about this requirement, which applies to U.S. citizens and non-U.S. citizens alike, you may contact our personnel office.

7.     **Entire Agreement**.   This offer letter and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this offer, and supersede any and all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

8/9.     **Acceptance**.   This offer will remain open until February 15, 2008. If you decide to accept our offer, and I hope you will, please sign the enclosed copy of this letter in the space indicated and return it to me. Your signature will acknowledge that you have read and understood and agreed to the terms and conditions of this offer letter and the attached documents, if any. Should you have anything else that you wish to discuss, please do not hesitate to call me.

We look forward to the opportunity to welcome you to the Company.

Very truly yours,

PRESIDIO MEDIA INC.

Mark Pincus, President and Chief Executive Officer

H9000/00382/DOCS/1819854.1

Employment Offer
Page 3

I have read and understood this offer letter and hereby acknowledge, accept and agree to the terms as set forth above and further acknowledge that no other commitments were made to me as part of my employment offer except as specifically set forth herein.

Date signed: 02/15/2008

Kyle McEachern

<u>Attachments:</u>
Exhibit A          Employee Invention Assignment and Confidentiality Agreement

# Exhibit  B

## EMPLOYEE INVENTION ASSIGNMENT AND
## CONFIDENTIALITY AGREEMENT

In consideration of, and as a condition of my employment with Presidio Media Inc., a Delaware corporation (the "*Company*"), I hereby represent to, and agree with the Company as follows:

1.    **Purpose of Agreement.**   I understand that the Company is engaged in a continuous program of research, development, production and marketing in connection with its business and that it is critical for the Company to preserve and protect its "*Proprietary Information*" (as defined in Section 7 below), its rights in "*Inventions*" (as defined in Section 2 below) and in all related intellectual property rights. Accordingly, I am entering into this Employee Invention Assignment and Confidentiality Agreement (this "*Agreement*") as a condition of my employment with the Company, whether or not I am expected to create inventions of value for the Company.

2.    **Disclosure of Inventions.**   I will promptly disclose in confidence to the Company all inventions, improvements, designs, original works of authorship, formulas, processes, compositions of matter, computer software programs, databases, mask works and trade secrets that I make or conceive or first reduce to practice or create, either alone or jointly with others, during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets (the "*Inventions*").

3.    **Work for Hire; Assignment of Inventions.**   I acknowledge and agree that any copyrightable works prepared by me within the scope of my employment are "works for hire" under the Copyright Act and that the Company will be considered the author and owner of such copyrightable works. I agree that all Inventions that (i) are developed using equipment, supplies, facilities or trade secrets of the Company, (ii) result from work performed by me for the Company, or (iii) relate to the Company's business or actual or demonstrably anticipated research and development (the "*Assigned Inventions*"), will be the sole and exclusive property of the Company. I hereby irrevocably assign, and agree to assign, the Assigned Inventions to the Company. Attached hereto as Exhibit A is a list describing all inventions, original works of authorship, developments and trade secrets which were made by me prior to the date of this Agreement, which belong to me and which are not assigned to the Company ("*Prior Inventions*"). If no such list is attached, I agree that it is because no such Prior Inventions exist. I acknowledge and agree that if I use any of my Prior Inventions in the scope of my employment, or include them in any product or service of the Company, I hereby grant to the Company a perpetual, irrevocable, nonexclusive, world-wide, royalty-free license to use, disclose, make, sell, copy, distribute, modify and create works based on, perform or display such Prior Inventions and to sublicense third parties with the same rights.

4.    **Labor Code Section 2870 Notice.**   I have been notified and understand that the provisions of Sections 3 and 5 of this Agreement do not apply to any Assigned Invention that qualifies fully under the provisions of Section 2870 of the California Labor Code (or any comparable law of any other State), which states as follows:

*ANY PROVISION IN AN EMPLOYMENT AGREEMENT WHICH PROVIDES THAT AN EMPLOYEE SHALL ASSIGN, OR OFFER TO ASSIGN, ANY OF HIS OR HER RIGHTS IN AN INVENTION TO HIS OR HER EMPLOYER SHALL NOT APPLY TO AN INVENTION THAT THE EMPLOYEE DEVELOPED ENTIRELY ON HIS OR HER OWN TIME WITHOUT USING THE EMPLOYER'S EQUIPMENT, SUPPLIES, FACILITIES, OR TRADE SECRET INFORMATION EXCEPT FOR THOSE INVENTIONS THAT EITHER: (1) RELATE AT THE TIME OF CONCEPTION OR REDUCTION TO PRACTICE OF THE INVENTION TO THE EMPLOYER'S BUSINESS, OR ACTUAL OR DEMONSTRABLY ANTICIPATED RESEARCH OR DEVELOPMENT OF THE EMPLOYER; OR (2) RESULT FROM ANY WORK PERFORMED BY THE EMPLOYEE FOR THE EMPLOYER. TO THE EXTENT A PROVISION IN AN EMPLOYMENT AGREEMENT PURPORTS TO REQUIRE AN EMPLOYEE TO ASSIGN AN INVENTION OTHERWISE EXCLUDED FROM BEING REQUIRED TO BE ASSIGNED UNDER CALIFORNIA LABOR CODE SECTION 2870(a), THE PROVISION IS AGAINST THE PUBLIC POLICY OF THIS STATE AND IS UNENFORCEABLE.*

5.    **Assignment of Other Rights.**    In addition to the foregoing assignment of Assigned Inventions to the Company, I hereby irrevocably transfer and assign to the Company: (i) all worldwide patents, patent applications, copyrights, mask works, trade secrets and other intellectual property rights, including but not limited to rights in databases, in any Assigned Inventions, along with any registrations of or applications to register such rights; and (ii) any and all "Moral Rights" (as defined below) that I may have in or with respect to any Assigned Inventions. I also hereby forever waive and agree never to assert any and all Moral Rights I may have in or with respect to any Assigned Inventions, even after termination of my work on behalf of the Company. *"Moral Rights"* mean any rights to claim authorship of or credit on an Assigned Inventions, to object to or prevent the modification or destruction of any Assigned Inventions or Prior Inventions licensed to Company under Section 3, or to withdraw from circulation or control the publication or distribution of any Assigned Inventions or Prior Inventions licensed to Company under Section 3, and any similar right, existing under judicial or statutory law of any country or subdivision thereof in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

6.    **Assistance.**    I agree to assist the Company in every proper way to obtain for the Company and enforce patents, copyrights, mask work rights, trade secret rights and other legal protections for the Company's Assigned Inventions in any and all countries. I will execute any documents that the Company may reasonably request for use in obtaining or enforcing such patents, copyrights, mask work rights, trade secrets and other legal protections. My obligations under this paragraph will continue beyond the termination of my employment with the Company, provided that the Company will compensate me at a reasonable rate after such termination for time or expenses actually spent by me at the Company's request on such assistance. I appoint

the Secretary of the Company as my attorney-in-fact to execute documents on my behalf for this purpose.

7.     **Proprietary Information.**   I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information of a confidential or secret nature that may be disclosed to me by the Company or a third party that relates to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company or any other party with whom the Company agrees to hold information of such party in confidence (the "*Proprietary Information*").   Such Proprietary Information includes, but is not limited to, Assigned Inventions, marketing plans, product plans, business strategies, financial information, forecasts, personnel information, customer lists and data, and domain names.

8.     **Confidentiality.**   At all times, both during my employment and after its termination, I will keep and hold all such Proprietary Information in strict confidence and trust.   I will not use or disclose any Proprietary Information without the prior written consent of the Company, except as may be necessary to perform my duties as an employee of the Company for the benefit of the Company.   Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company and, upon Company request, will execute a document confirming my agreement to honor my responsibilities contained in this Agreement.   I will not take with me or retain any documents or materials or copies thereof containing any Proprietary Information.

9.     **No Breach of Prior Agreement.**   I represent that my performance of all the terms of this Agreement and my duties as an employee of the Company will not breach any invention assignment, proprietary information, confidentiality or similar agreement with any former employer or other party.   I represent that I will not bring with me to the Company or use in the performance of my duties for the Company any documents or materials or intangibles of a former employer or third party that are not generally available to the public or have not been legally transferred to the Company.

10.     **Efforts; Duty Not to Compete.**   I understand that my employment with the Company requires my undivided attention and effort.   As a result, during my employment, I will not, without the Company's express written consent, engage in any other employment or business that (i) directly competes with the current or future business of the Company; (ii) uses any Company information, equipment, supplies, facilities or materials; or (iii) otherwise conflicts with the Company's business interest and causes a disruption of its operations.

11.     **Notification.**   I hereby authorize the Company to notify third parties, including, without limitation, customers and actual or potential employers, of the terms of this Agreement and my responsibilities hereunder.

12.     **Non-Solicitation of Employees/Consultants.**   During my employment with the Company and for a period of one (1) year thereafter, I will not directly or indirectly solicit away employees or consultants of the Company for my own benefit or for the benefit of any other person or entity.

13.   **Non-Solicitation of Suppliers/Customers.** During and after the termination of my employment with the Company, I will not directly or indirectly solicit or otherwise take away customers or suppliers of the Company if, in so doing, I access, use or disclose any trade secrets or proprietary or confidential information of the Company. I acknowledge and agree that the names and addresses of the Company's customers and suppliers, and all other confidential information related to them, including their buying and selling habits and special needs, whether created or obtained by, or disclosed to me during my employment, constitute trade secrets or proprietary or confidential information of the Company.

14.   **Name & Likeness Rights.** I hereby authorize the Company to use, reuse, and to grant others the right to use and reuse, my name, photograph, likeness (including caricature), voice, and biographical information, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed (including, but not limited to, film, video and digital or other electronic media), both during and after my employment, for any purposes related to the Company's business, such as marketing, advertising, credits, and presentations.

15.   **Injunctive Relief.** I understand that in the event of a breach or threatened breach of this Agreement by me the Company may suffer irreparable harm and will therefore be entitled to injunctive relief to enforce this Agreement.

16.   **Governing Law; Severability.** This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to its laws pertaining to conflict of laws. If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.

17.   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.

18.   **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

19.   **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. No waiver

granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than that actual performance specifically waived.

20.   **Successors and Assigns; Assignment.**   Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.   The Company may assign any of its rights and obligations under this Agreement.   No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

21.   **Further Assurances.**   The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

22.   **"At Will" Employment.**   I understand that this Agreement does not constitute a contract of employment or obligate the Company to employ me for any stated period of time.   I understand that I am an "at will" employee of the Company and that my employment can be terminated at any time, with or without notice and with or without cause, for any reason or for no reason, by either the Company or myself.   I acknowledge that any statements or representations to the contrary are ineffective, unless put into a writing signed by the Company.   I further acknowledge that my participation in any stock option or benefit program is not to be construed as any assurance of continuing employment for any particular period of time.   This Agreement shall be effective as of the first day of my employment by the Company, which is February 19, 2008.

**Presidio Media Inc.:**

By: _____

Name:   Mark Pincus

Title:   Chief Executive Officer

**Employee:**

_____
Signature

Kyle McEachern
Name (Please Print)

Signature Page to Employee Invention Assignment and Confidentiality Agreement

## EXHIBIT A

### LIST OF PRIOR INVENTIONS

Identifying Number
of Brief Description

Title                    Date

___X___ **No inventions or improvements**

Signature of Employee:

Print Name of Employee:

KYLE McEACHERN

Date: 02/26/2008

H9000/00382/DOCS/1819852.1

# Exhibit  C

**Zynga, Inc.**
## TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to the Zynga, Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company")

I further certify that I have complied with all the terms of the Company's Employment Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Employment, Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer software, database information, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees to leave their employment.


2/20/09
(Date)


(Employee's Signature)


KYLE McEACHERN
(Type/Print Employee's Name)

# Exhibit  D

## CONSULTING AGREEMENT

This Consulting Agreement ("*Agreement*") is made as of <u>March 13, 2009</u> ("*Effective Date*"), by and between Zynga Inc., a Delaware corporation having its principal place of business at 365 Vermont Street, San Francisco, CA 94103 ("*Company*"), and <u>Kyle McEachern</u>("*Consultant*").

Company desires to have Consultant perform consulting services for Company and Consultant desires to perform such services for Company, subject to and in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, the parties agree as follows:

1.    **SERVICES.**

1.1    <u>Performance of Services</u>.    Consultant will perform the consulting services ("*Services*") described in detail on <u>Exhibit A</u> to this Agreement ("*Statement of Work*") in accordance with the terms and conditions of this Agreement and the Statement of Work. Consultant hereby acknowledges that Consultant began performing Services to Company as of <u>March 13, 2009</u>, (the "*Commencement Date*").

1.2    <u>Payment</u>.    Company will pay Consultant fees in accordance with the terms set forth in the Statement of Work. If the Statement of Work requires Consultant to complete certain milestones, Company's payment obligation will be expressly subject to Consultant's completion of such milestones to Company's reasonable satisfaction. Unless otherwise specified in the Statement of Work, Company will not reimburse Consultant for any expenses incurred by Consultant in connection with performing Services. Subject to the foregoing, Company will pay each invoice submitted by Consultant within thirty (30) days following receipt thereof.

2.    **RELATIONSHIP OF PARTIES.**

2.1    <u>Independent Contractor</u>.    Consultant is an independent contractor and is not an agent or employee of, and has no authority to bind, Company by contract or otherwise. Consultant will perform the Services under the general direction of Company, but Consultant will determine, in Consultant's sole discretion, the manner and means by which the Services are accomplished, subject to the requirement that Consultant will at all times comply with applicable law. Company has no right or authority to control the manner or means by which the Services are accomplished.

2.2    <u>Employment Taxes and Benefits</u>.    Consultant will report as self-employment income all compensation received by Consultant pursuant to this Agreement. Consultant will indemnify Company and hold it harmless from and against all claims, damages, losses, costs and expenses, including reasonable fees and expenses of attorneys and other professionals, relating to any obligation imposed by law on Company to pay any withholding taxes, social security, unemployment or disability insurance, or similar items in connection with compensation received by Consultant pursuant to this Agreement. Consultant will not be entitled to receive any vacation or illness payments or to participate in any plans, arrangements, or distributions by Company pertaining to any bonus, stock option, profit sharing, insurance or similar benefits for Company's employees.

2.3    <u>Liability Insurance</u>.    Consultant will maintain adequate insurance to protect Consultant from the following: (i) claims under workers' compensation and state disability acts; (ii) claims for damages because of bodily injury, sickness, disease or death that arise out of any negligent

H9000/00382/SF/5215463.1

act or omission of Consultant; and (iii) claims for damages because of injury to or destruction of tangible or intangible property, including loss of use resulting therefrom, that arise out of any negligent act or omission of Consultant.

### 3.    OWNERSHIP AND INTELLECTUAL PROPERTY RIGHTS.

3.1    <u>Definition of Innovations</u>. Consultant agrees to disclose in writing to Company all inventions, products, designs, drawings, notes, documents, information, documentation, improvements, works of authorship, processes, techniques, know-how, algorithms, technical and business plans, specifications, hardware, circuits, computer languages, computer programs, databases, user interfaces, encoding techniques, and other materials or innovations of any kind that Consultant may make, conceive, develop or reduce to practice, alone or jointly with others, in connection with performing Services or that result from or that are related to such Services, whether or not they are eligible for patent, copyright, mask work, trade secret, trademark or other legal protection (collectively, "*Innovations*").

3.2    <u>Ownership of Innovations</u>. Consultant and Company agree that, to the fullest extent legally possible, all Innovations will be works made for hire owned exclusively by Company. Consultant agrees that, regardless of whether the Innovations are legally works made for hire, all Innovations will be the sole and exclusive property of Company, including without limitation all Innovations resulting from Services performed by Consultant on and after the Commencement Date but before the Effective Date. Consultant hereby irrevocably transfers and assigns to Company, and agrees to irrevocably transfer and assign to Company, all right, title and interest in and to the Innovations (including without limitation all Innovations resulting from Services performed by Consultant on and after the Commencement Date but before the Effective Date, including all worldwide patent rights (including patent applications and disclosures), copyright rights, mask work rights, trade secret rights, know-how, and any and all other intellectual property or proprietary rights (collectively, "*Intellectual Property Rights*") therein. At Company's request and expense, during and after the term of this Agreement, Consultant will assist and cooperate with Company in all respects and will execute documents, and, subject to the reasonable availability of Consultant, give testimony and take such further acts reasonably requested by Company to enable Company to acquire, transfer, maintain, perfect and enforce its Intellectual Property Rights and other legal protections for the Innovations. Consultant hereby appoints the officers of Company as Consultant's attorney-in-fact to execute documents on behalf of Consultant for this limited purpose.

3.3    <u>Moral Rights</u>. Consultant also hereby irrevocably transfers and assigns to Company, and agrees to irrevocably transfer and assign to Company, and waives and agrees never to assert, any and all Moral Rights (as defined below) that Consultant may have in or with respect to any Innovation, during and after the term of this Agreement. "*Moral Rights*" mean any rights to claim authorship of any Innovation, to object to or prevent the modification or destruction of any Innovation, to withdraw from circulation or control the publication or distribution of any Innovation, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is called or generally referred to as a "moral right," in all cases including without limitation all Innovations resulting from Services performed by Consultant on and after the Commencement Date but before the Effective Date.

3.4    <u>Related Rights</u>. To the extent that Consultant owns or controls (presently or in the future) any patent rights, copyright rights, mask work rights, trade secret rights, or any other intellectual property or proprietary rights that block or interfere with the rights assigned to Company under this Agreement (collectively, "*Related Rights*"), Consultant hereby grants or will cause to be granted to Company a non-exclusive, royalty-free, irrevocable, irrevocable, perpetual, transferable, worldwide license (with the right to sublicense) to make, have made, use, offer to sell, sell, import, copy,

modify, create derivative works based upon, distribute, sublicense, display, perform and transmit any products, software, hardware, methods or materials of any kind that are covered by such Related Rights, to the extent necessary to enable Company to exercise all of the rights assigned to Company under this Agreement.

4.    **CONFIDENTIAL INFORMATION.** For purposes of this Agreement, *"Confidential Information"* means and will include: (i) any information, materials or knowledge regarding Company and its business, financial condition, products, programming techniques, customers, suppliers, technology or research and development that is disclosed to Consultant or to which Consultant has access in connection with performing Services (including without limitation all such information, materials or knowledge disclosed to Consultant or to which Consultant had on and after the Commencement Date but before the Effective Date); (ii) the Innovations; and (iii) the existence and terms and conditions of this Agreement. Confidential Information will not include, however, any information that is or becomes part of the public domain through no fault of Consultant or that Company regularly gives to third parties without restrictions on use or disclosure. Consultant agrees to hold all Confidential Information in strict confidence, not to use it in any way, commercially or otherwise, except in performing the Services, and not to disclose it to others. Consultant further agrees to take all action reasonably necessary to protect the confidentiality of all Confidential Information including, without limitation, implementing and enforcing procedures to minimize the possibility of unauthorized use or disclosure of Confidential Information.

5.    **WARRANTIES.**

5.1    <u>Competitive Activities</u>.  During the term of this Agreement, Consultant will not, directly or indirectly, in any individual or representative capacity, engage or participate in or provide services to any business that is competitive with the types and kinds of business being conducted by Company.

5.2    <u>Pre-existing Obligations</u>.  Consultant represents and warrants that Consultant has no pre-existing obligations or commitments (and will not assume or otherwise undertake any obligations or commitments) that would be in conflict or inconsistent with, or that would hinder Consultant's performance of its obligations under this Agreement.

5.3    <u>Solicitation of Services</u>.    Because of the trade secret subject matter of Company's business, Consultant agrees that, during the term of this Agreement and for a period of one (1) year thereafter, it will not solicit the services of any of Company's employees, consultants, suppliers or customers for Consultant's own benefit or for the benefit of any other person or entity.

6.    **INDEMNIFICATION.** Consultant will indemnify and hold harmless Company from and against all claims, damages, losses and expenses, including court costs and reasonable attorneys' fees, arising out of or resulting from, and, at Company's option, Consultant will defend Company against:

(i)    any action by a third party against Company that is based on a claim that any Services, the results of any Services (including any Innovations), or Company's use thereof, infringe, misappropriate or violate a third party's Intellectual Property Rights; and

(ii)    any action by a third party against Company that is based on any negligent act or omission or willful conduct of Consultant and that results in: (a) bodily injury, sickness, disease or death; (b) injury or destruction to tangible or intangible property (including computer programs and data) or any loss of use resulting therefrom; or (c) the violation of any statute, ordinance, or regulation.

7.     **TERM AND TERMINATION.**

    7.1    Term.  This Agreement will commence on the Effective Date and, unless terminated earlier in accordance with the terms of this Agreement, will remain in force and effect for as long as Consultant is performing Services pursuant to the Statement of Work.

    7.2    Termination for Breach.  Either party may terminate this Agreement (including the Statement of Work) if the other party breaches any material term of this Agreement and fails to cure such breach within ten (10) days following written notice thereof from the non-breaching party.

    7.3    Termination for Convenience.  Either party may terminate this Agreement (including the Statement of Work) at any time, for any reason or no reason, by one (1) day's advanced written notice to the other party.

    7.4    Effect of Termination.

        (a)    Upon the expiration or any termination of this Agreement for any reason, Consultant will promptly deliver to Company all Innovations, including all work in progress on any Innovations and all versions and portions thereof.

        (b)    Upon the expiration or any termination of this Agreement (except termination of this Agreement pursuant by Company pursuant to Section 7.2 for breach by Consultant), Company will pay Consultant any amounts that are due and payable under Section 1.2 for Services performed by Consultant prior to the effective date of expiration or termination.

        (c)    Upon the expiration or termination of this Agreement for any reason, Consultant will promptly notify Company of all Confidential Information in Consultant's possession or control and will promptly deliver all such Confidential Information to Company, at Consultant's expense and in accordance with Company's instructions.

    7.5    Survival.  The provisions of Sections 2.2, 3, 4, 5.3, 6, 7.4, 7.5, 8 and 9 will survive the expiration or termination of this Agreement.

8.     **LIMITATION OF LIABILITY.**  IN NO EVENT WILL COMPANY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND IN CONNECTION WITH THIS AGREEMENT, EVEN IF COMPANY HAS BEEN INFORMED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES.

9.     **GENERAL.**

    9.1    No Election of Remedies.  Except as expressly set forth in this Agreement, the exercise by Company of any of its remedies under this Agreement will be without prejudice to its other remedies under this Agreement or available at law or in equity.

    9.2    Assignment.  Consultant may not assign or transfer any of Consultant's rights or delegate any of Consultant's obligations under this Agreement, in whole or in part, without Company's express prior written consent.  Any attempted assignment, transfer or delegation, without such consent, will be void.  Subject to the foregoing, this Agreement will be binding upon and will inure to the benefit of the parties permitted successors and assigns.

    9.3    Equitable Remedies.  Because the Services are personal and unique and because Consultant will have access to Confidential Information of Company, Company will have the right to

enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without having to post a bond or other consideration, in addition to all other remedies that Company may have for a breach of this Agreement.

      9.4    <u>Attorneys' Fees.</u>  If any action is necessary to enforce the terms of this Agreement, the substantially prevailing party will be entitled to reasonable attorneys' fees, costs and expenses in addition to any other relief to which such prevailing party may be entitled.

      9.5    <u>Governing Law.</u>  This Agreement will be governed by and construed in accordance with the laws of the State of California, excluding that body of law pertaining to conflict of laws. Any legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in the Northern District of California and the parties hereby irrevocably consent to the personal jurisdiction and venue therein.

      9.6    <u>Severability.</u>  If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions of the Agreement will remain in full force and effect, and the provision affected will be construed so as to be enforceable to the maximum extent permissible by law.

      9.7    <u>Notices.</u>  All notices required or permitted under this Agreement will be in writing and delivered by confirmed facsimile transmission, by courier or overnight delivery service, or by certified mail, and in each instance will be deemed given upon receipt. All notices will be sent to the addresses set forth above or to such other address as may be specified by either party to the other in accordance with this Section.

      9.8    <u>Entire Agreement.</u>  This Agreement, together with the Statement of Work, constitutes the complete and exclusive understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral, with respect to the subject matter hereof. In the event of a conflict, the terms and conditions of the Statement of Work will take precedence over the terms and conditions of this Agreement. Any waiver, modification or amendment of any provision of this Agreement will be effective only if in writing and signed by the parties hereto.

      9.9    <u>Waiver.</u>  The waiver of any breach of any provision of this Agreement will not constitute a waiver of any subsequent breach of the same other provisions hereof.

      9.10   <u>Counterparts.</u>  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

      IN WITNESS WHEREOF, the parties have signed this Agreement as of the Effective Date.

**COMPANY:**                         **CONSULTANT:**

By: _____         By: _____

Name: <u>Whitney Chang</u>           Name: <u>Kyle McEachern</u>

Title: <u>Corporate Controller</u>       Title: <u>Software Engineer</u>

Date: _____       Date: <u>3/ 13 / 2009</u>

H9000/00382/SF/5215463.1             5

### EXHIBIT A

#### Statement of Work

This Statement of Work is issued under and subject to all of the terms and conditions of the Consulting Agreement dated as of <u>March 13, 2009</u> by and between Zynga Inc., a Delaware corporation (the "*Company*"), and <u>Kyle McEachern</u> ("*Consultant*").

1.  **Description of Service:  Tagged implementation of Mafia Wars.**

2.  **Payment Terms:  Will receive $12,500 upon completion of deliverables.**

3.  **Commencement Date:** March 13, 2009 **End Date:** March 27, 2009

4.  **Other Terms**

**AGREED AS OF March 13, 2009**

COMPANY:

By: _____

Name: <u>Whitney Chang</u>

Title: <u>Corporate Controller</u>

Date: <u>03/13/09</u>

CONSULTANT:

By: _____

Name: <u>Kyle McEachern</u>

Title: <u>Software Engineer</u>

Date: <u>3/13/2009</u>